1

2

3

4                                                  **E-FILED on**    2/8/13

5

6

7                                    NOT FOR CITATION

8                       IN THE UNITED STATES DISTRICT COURT

9                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                  SAN JOSE DIVISION

11

12   TETSUYA JOE NOMURA,

13           Plaintiff,

14        v.                                  No. C-11-01208 HRL

15   YOUTUBE, LLC.,

16           Defendant.

17                                            **ORDER CONSTRUING CLAIMS OF U.S.**
                                              **PATENT NO. 7,254,622**
18   TETSUYA JOE NOMURA,

19           Plaintiff,

20        v.                                  No. C-11-01210 HRL

21   AMAZON.COM, INC.,

22           Defendant.

23

24        On December 14, 2012, the court held a claim construction hearing for the purpose of

25   construing disputed terms in the claims of U.S. Patent No. 7,254,622 ("'622 Patent").  Pursuant to

26   Patent Local Rule 4-3, on August 31, 2012, the parties filed a Joint Claim Construction Statement

27   ("JCCS") identifying ten terms in the '622 patent as the "most significant to the resolution of the

28

United States District Court
For the Northern District of California

case." Case. No. 11-01208, Dkt. No. 72[1]; *see* Patent L.R. 4-3(c) (requiring the parties to identify "the terms whose construction will be most significant to the resolution of the case up to a maximum of 10"). Since the JCCS, the parties have agreed on the construction of two disputed terms: "sorted by category and classified," Response Br. 6, Dkt. No. 75, and "customers" (agreed upon at the claim construction hearing). On December 7, 2012, the court denied Nomura's motion to strike modifications to defendant's proposed claim constructions in defendant's responsive claim construction briefs, and has considered the defendants' modified proposed claim constructions to the extent they are helpful and narrow the issues before the court. *See* Dkt. No. 86. After consideration of the claims, specification, and other relevant evidence, and after hearing the arguments of the parties, the court construes the disputed terms of the '622 Patent as set forth below.

## I. BACKGROUND OF THE INVENTION

On August 7, 2007, the United States Patent and Trademark Office issued U.S. Patent No. 7,254,622 ("'622 Patent"), titled "VIDEO-ON-DEMAND SYSTEM," to plaintiff Tetsuya Joe Nomura ("Nomura"). The '622 Patent is directed to a three tiered architecture for inputting, converting, and storing video data files that are ultimately accessed, downloaded, and viewed by customers.

The claimed system inputs video data into "first" and "second" data input stations. The first data input station uses a video reading device to input original video data from their original storage medium, for example, video tapes, videocassettes, videodisks, or film. '622 Patent col.5 ll.20-31. The second data input station uses either a video reading device, a telecommunications interface, and/or a computer to input original video data from an electronic data format. *Id.* col.5 ll.34-42.

The video data (from the data input stations) enters the claimed system through a "video data capture computer," which converts the inputted video data files into a preferred data storage format, *e.g.*, a compressed data format, and stores the converted video data in a "first generation video data storage unit" (or "tier 1"). *Id.* col.5 ll.45-48. Video data files from the first generation storage unit are then transferred over a "high speed data link" to a "second generation video data storage unit" (or

---

[1] The court cites to the docket in Case No. 11-01208 for simplicity. The same documents are filed in Case No. 11-01210.

1   "tier 2"). In tier 2, the video data files are sorted by category and classified in indexed master files.

2   *Id.* col.6 ll.13-18. Claims 2, 3, and 12 also call for "back-up" first and second generation video data

3   storage units containing back-up data libraries of the files in the respective tier. The specification

4   provides that the back-up storage units are preferably "housed at another location that is protected . .

5   . for security against data loss," or may be "housed at the same location . . . using a separate electrical

6   power supply for security against data loss." *Id.* col.5 l.66-col.6 l.12.

7       Customers access the system through a remotely accessible computer server (or "tier 3"). *Id.*

8   col.6 ll.46-48. When a customer requests a video data file, tier 3 receives the request, accesses the

9   video data file in tier 2, and tier 2 uploads the video data file to tier 3 over a high speed data link. *Id.*

10  col.6 ll.59-64. The specification provides that "customer access to the video data . . . is provided . . .

11  through an Internet Service Provider (ISP) and/or an Application Service Provider (ASP) interface.

12  Preferably, the remotely accessible computer provides customer *access* via the Internet and/or World

13  Wide Web (WWW), as well as through telephone lines, digital subscriber lines (DSL), cable

14  television lines, multimedia cable, and fiberoptic cable connections." *Id.* col.6 ll.46-54.

15      The claims also call for an "error detection system" for monitoring the downloading of video

16  data. The error detection system is configured to stop the downloading of the video data file if an

17  error is detected and to restart the downloading from the point immediately before the point of

18  corruption. *See e.g., id.* col.11 ll.7-23, 45-59. In the event of repeated errors during downloading,

19  the error detection system initiates the system to "restore" the data file from a lower tier server, or

20  from a back-up data storage unit. *Id.* The specification describes the error detection system as "error

21  detection and correction software." *Id.* col.7 ll.24-26, col.10 ll.2-3.

## II. CLAIM CONSTRUCTION

### A. Legal Standard

24      Claim construction is exclusively within the province of the court. *Markman v. Westview*

25  *Instruments, Inc.*, 517 U.S. 370, 387 (1996). "It is a 'bedrock principle' of patent law that 'the claims

26  of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v.*

27  *AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim terms "are generally given their

28  ordinary and customary meaning," defined as "the meaning . . . the term would have to a person of

*(left margin, vertical text)* **United States District Court** For the Northern District of California

1  ordinary skill in the art in question . . . as of the effective filing date of the patent application." *Id.* at

2  1313 (internal citation omitted).  The skilled artisan reads the claim term "in the context of the entire

3  patent . . . including the specification." *Id.*; *see also Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133

4  F.3d 1473, 1477 (Fed. Cir. 1998).  In determining the meaning of a disputed claim limitation, the

5  intrinsic evidence, including the claim language, written description, and prosecution history, is the

6  most significant. *Phillips*, 415 F.3d at 1315-17.  The court reads the claims in light of the

7  specification, which is "the single best guide to the meaning of a disputed term." *Id.* at 1315.

8  Furthermore, "the interpretation to be given a term can only be determined and confirmed with a full

9  understanding of what the inventors actually invented and intended to envelop with the claim." *Id.* at

10  1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

11  The words of the claims must be understood as the inventor used them as revealed by the patent and

12  prosecution history.  *Id.*  "In some cases, the ordinary meaning of claim language as understood by a

13  person of skill in the art may be readily apparent even to lay judges, and claim construction in such

14  cases involves little more than the application of the widely accepted meaning of commonly

15  understood words." *Id.* at 1314.

16      Although extrinsic evidence is less significant than the intrinsic record, the court may also

17  reference extrinsic evidence to "shed useful light on the relevant art." *Id.* at 1317 (quoting *C.R.*

18  *Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).  "[T]echnical dictionaries

19  may provide [help] to a court 'to better understand the underlying technology' and the way in which

20  one of skill in the art might use the claim terms. . . .  Such evidence . . . may be considered if the

21  court deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Id.* at

22  1318 (internal citations omitted).

**B. Disputed Terms**

**1. "configured to not be remotely accessible [by customers]" [claims 1, 12]**

| Defendants' Construction | Nomura's Construction |
|---|---|
| "configured to prevent access by a remote device" | ordinary meaning; or<br><br>" . . . the first [second] system tier configured to not be connected to remotely" |

United States District Court
For the Northern District of California

1   The parties dispute whether this claim term requires that the first and second tier servers be

2   configured to prevent or deny access by a customer's *remote device.* Nomura contends that the terms

3   "configured," "access," and "remote" are commonly understood, and thus no construction is

4   necessary. He asserts that defendant's proposed construction improperly narrows the claim term by

5   adding the word "device." According to Nomura, the plain language of the claim is clear that the

6   system denies access *to customers*, not their devices. For example, Nomura argues that "[t]here are

7   many ways to deny access to customers[:] passwords, security codes, etc. *These methods of denying*

8   *remote access to the customers actually require that the underlying device have access to the system*

9   in order for the customer access to be denied." Reply Br. 3, Dkt. No. 79 (emphasis added). Nomura

10  also contends that the word "prevent" in defendants' proposed construction is too limiting because

11  "the claims simply refer to and describe the *absence* of remote access." Reply Br. 3. As an

12  alternative to the plain and ordinary meaning, Nomura offers a construction requiring only that the

13  first and second tiers are "configured to not be *connected to* remotely" (emphasis added).

14      Defendants argue that the claimed first and second system tiers must be "configured to

15  prevent access by a remote device." According to defendants, this claim term "is properly

16  interpreted as configured to *prevent or block* remote access." Response Br. 6. Defendants' position

17  is that the claim requires some type of physical or electronic barrier resulting in a complete block to

18  physical connectivity by a customer's device. *Id.* ("This absence of access [in the asserted claims]

19  could be the result of a physical or electronic barrier or restraint, a lack of physical connectivity, or a

20  network firewall to name a few.").

21      The court disagrees with Nomura that no construction is required because the plain and

22  ordinary meaning does not resolve the parties' dispute as to whether remote access is denied to

23  customer's *devices. See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361

24  (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and

25  ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when

26  reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."). While the plain

27  language of the claim requires that the first and second tier servers be "configured to not be remotely

28  accessible *by customers*" (emphasis added), the court is not persuaded that one of skill in the art

1   would read the claim term as Nomura suggests, *i.e.*, as permitting access to a customer's *device*, yet

2   somehow still denying access to the customer (*e.g.*, with a password or security code).  The '622

3   Patent specification defines "customer access" as follows:

> The customer can contact and interact with the video-on-demand system in a number
> of different ways, such as through a website connection on the Internet or the World
> Wide Web, through a cable television subscriber network, a local area network (LAN)
> or a wide area network (WAN) connected via an Internet connection or a direct
> connection via cable or telephone lines or through a wireless telecommunications
> system . . . .
>
> Customer access to the video data of movies and other video programs is provided by
> a remotely accessible computer server through an Internet Service Provider (ISP)
> and/or an Application Service Provider (ASP) interface.  Preferably, the remotely
> accessible computer provides customer access via the Internet and/or World Wide
> Web (WWW), as well as through telephone lines, digital subscriber lines (DSL),
> cable television lines, multimedia cable, and fiberoptic cable connections.

11  '622 Patent col.3 ll.45-52, col.6 ll.46-54.  Customer access via the means described above is

12  accomplished on a device.  *See, e.g., id.* col.10 ll.15-20 ("If the customer contacts the system to place

13  an order through a different *device* than the *device* used for storing and viewing the video data files,

14  the order processing and the video data file downloading may be handled on different computer

15  servers . . . ." (emphases added)).  Nomura's own extrinsic source confirms that "access," in the

16  context of a computer system, is accomplished by a device.  *See* MS Computer Dictionary (5th ed.

17  2002), Opening Br., ex. B, Dkt. No. 78-3 ("**access** *n.* 1.  The act of reading data from or writing data

18  *to memory.* 2.  Connection to the Internet or other network or system." (emphasis added)).  Indeed,

19  citing this MS computer dictionary definition, Nomura argues that "access may imply a connection

20  from the customer by some means of electronic device."  Opening Br. 7, Dkt. No. 78.  Because the

21  '622 Patent only contemplates access by *a device*, "not remotely accessible" logically also refers to

22  "not remotely accessible" by *a device*.  Nomura fails to point to any language in the '622 Patent

23  indicating that the asserted claims contemplate granting access (to the first and second tiers) by a

24  customer's device.  Nomura's concern expressed at the claim construction hearing that certain

25  devices (*e.g.*, devices owned by system *operators*) would be required to access the first and second

26  tier servers lacks merit because defendants' proposed construction only prevents access by *customers'*

27  devices.  *See* Section II.B.8 *infra* (construing "customers" to mean "system users," not "system

28  operators").

United States District Court
For the Northern District of California

With respect to the word "prevent" in defendants' proposed construction, the only reasonable way that the first and second tier servers could be "configured to not be remotely accessible" is if they are configured in some way to prevent or deny customer access to the those tiers. Nomura does not actually dispute that the system denies customer access to the first and second tier servers by some preventative means. *See* Reply Br. 3 ("There are many ways to deny access to customers; passwords, security codes, etc."). Nomura offers no alternative other than stating that the claims contemplate only "the absence of remote access." The mere "absence of remote access" is vague, and would require further construction. *See, e.g., PureChoice, Inc. v. Honeywell Intern., Inc.*, 333 Fed. Appx. 544, 547 (Fed. Cir. June 1, 2009) (unpublished) (rejecting a construction that "does not inform the public what qualities the invention is concerned with, and is overbroad").

Accordingly, the court adopts defendants' proposed construction, adding the words "or deny" (which comport with both parties' proposed constructions and the court's understanding of the system configuration), and construes the term "configured to not be remotely accessible [by customers]" to mean: "configured to prevent or deny access by a [customer's] remote device."

### 2. "sorted by category and classified [in indexed master files]" [claims 1, 12]

The parties agree that the term "sorted by category and classified [in indexed master files]" should be construed to mean: "organized by category and indexed in master files." The court adopts the parties agreed upon construction.

### 3. "a back-up . . . video data storage unit for storing back-up . . . video data files" [claims 2, 3, 5, 12]

| Defendants' Construction | Nomura's Construction |
|---|---|
| "a separate data storage unit that stores copies of video data files for restoring video data files after a data loss or corruption event." | ordinary meaning; or<br><br>"an additional video data storage unit for storing copies . . . of the video data files." |

The parties primarily dispute whether the back-up unit must be physically separate from the data storage unit. Nomura argues that defendants improperly attempt to narrow the claim to require the back-up units to be physically separate from the other data storage units. According to Nomura, "the back[-]up unit can be logically separate, without being physically separate. For example, it was

1   well known in the art at the time of filing that multiple computers could be stored in a single physical

2   'rack.'" Reply Br. 5.  Nomura contends that although physical separation has many advantages, those

3   preferred embodiments that are disclosed in the specification should not be "read into the claims."

4   *Id.*  Moreover, Nomura argues that the defendants' proposed functional requirement—that the copies

5   of the video data files be used "for restoring video data files after a data loss or corruption event"—is

6   improper with respect to claims 2, 3, and 5 for two reasons: (1) it is a functional limitation and the

7   claim is directed to a structure; and (2) the functional limitation is already explicitly recited as an

8   additional limitation in claim 12, *see* '622 Patent col.12 l.61-col.13 l.3, and is thus not implicit in this

9   claim limitation.

10          Defendants argue that the term "back-up . . . storage unit" is unclear on its face and, thus, it is

11   necessary to look to the specification for a definition.  Defendants point to the preferred

12   embodiments disclosed in relation to figure 1 for support that the "back-up" storage unit must be

13   physically separate from the video data storage units.  *See* Response Br. 8 ("The specification further

14   explains that, '[p]referably, the system also includes back-up data storage units 108, 110 *housed at*

15   *another location for security against data loss* from data storage units . . . .'" (italics in brief)).

16   Defendants do not address Nomura's argument regarding the functional limitation.

17          The court agrees with Nomura.  The plain language of the claim does not limit the back-up

18   storage unit to a separate location.  The passages in the specification that defendants rely on, such as

19   the one cited above, are preceded with the word "preferably."  *See, e.g.,* '622 Patent col.4 l.36, col. 5

20   l.66, col.6 l.38.  Moreover, the specification also states an alternative option for the location of the

21   back-up storage unit, indicating that the drafter contemplated various possibilities: "Alternatively, or

22   in addition, a back-up first generation video data storage unit 104 *may be housed at the same*

23   *location as the first generation video data storage unit* 103, but using a separate electrical power

24   supply for security against data loss."  *Id.* col.3 ll.9-11.  Accordingly, the examples in the

25   specification are not limiting.  To the extent there is any doubt as to the meaning of the term based

26   on the intrinsic evidence, only Nomura cites extrinsic evidence to guide the court, which, of course,

27   comports with Nomura's proposed construction.  *See* MS Computer Dictionary (5th Ed. 2002),

28   Opening Br., Ex. E. ("**backup** *n. A duplicative copy of a program, a disk or data*, made either for

United States District Court
For the Northern District of California

1   archiving purposes or for safeguarding valuable files from loss should the active copy be damages or

2   destroyed. . . ." (emphasis added)).  Because the plain language of the claim read in light of the

3   specification does not require physical separation, the court declines to narrow the claim term to

4   require physical separation.

5        Additionally, there is no basis upon which to include the purpose or function of the back-up

6   data unit in the claim construction, as defendants attempt to do with the phrase "*for restoring video*

7   *data files after a data loss or corruption event.*"  *See, e.g., Toro Co. v. White Consol. Indus., Inc.*, 266

8   F.3d 1367, 1371 (Fed. Cir. 2001) (explaining that it is improper to "import into the claim a function

9   from the specification, particularly when the claim recites only purely structural limitations").

10  Because the additional functional limitation in defendants' construction is explicitly present in claim

11  12, the disputed term is presumed to not include it, and defendants offer no argument to rebut this

12  presumption.  *See Seachange Int'l Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368-69 (Fed. Cir. 2005)

13  (Under the doctrine of claim differentiation "claims [are presumed to] have different scope when

14  different words or phrases are used in those claims.").

15       Accordingly, the court adopts Nomura's proposed construction and construes the term "a

16  back-up . . . video data storage unit for storing back-up . . . video data files" to mean: "an additional

17  video data storage unit for storing copies . . . of the video data files."

### 4. "a first data input station configured for uploading [original video data of movies or other video programs from their original storage medium]" [claims 10, 12]

| Defendants' Construction | Nomura's Construction |
| --- | --- |
| "a hardware device configured to receive the transmission of data from their original storage medium" | ordinary meaning; or<br><br>"a first data input station configured to receive" |

24       The parties primarily dispute whether the first data input station must be *a hardware* device.

25  Nomura argues that defendants' proposed hardware requirement is not present in the claim.  Nomura

26  also argues that the language added by defendants, "the transmission of data from their original

27  storage medium" is redundant of the claim language following the disputed term (bracketed in the

28  heading above), and thus unnecessary.

ORDER CONSTRUING CLAIMS OF U.S. PATENT NO. 7,254,622 ---No. C-11-01208 HRLNo. C-11-01210 HRL
9

United States District Court
For the Northern District of California

1  Defendants counter that "[t]he plain language of the claims does not specify what 'a first data

2  input station' is," and thus is it appropriate to look to the specification, which "makes several

3  references to the use of hardware devices in connection with receiving data." Response Br. 9. From

4  there, defendants "easily infer[]" that a "hardware device is needed." *Id.* It was not until the claim

5  construction hearing that defendants rely on a claim differentiation argument to support the hardware

6  limitation. Specifically, dependent claim 11 claims "[t]he video-on-demand system of claim 10,

7  further comprising: a second data input station configured for uploading original video data of

8  movies or other video programs *from electronic data format* to the video data capture computer."

9  '622 Patent col. 12 ll.38-43 (emphasis added). Defendants do not respond to Nomura's redundancy

10  argument.

11  The '622 Patent specification defines the first data input station and second data input station

12  as separate structures, thus indicating that the two are not interchangeable. The specification

13  explains that the "first data input station" receives video data "from their original storage medium,

14  for example from videotapes, videocasettes or videodisks," and "includes at least one video format

15  reading device such as a videotape, videocasette or videodisk player for reading the video data into

16  the system." *Id.* col.5 ll.20-31. In contrast, the specification provides that the "second data input

17  station" receives video data from "electronic data format on transferable storage media or over a

18  telecommunications line, such as a telephone line, multimedia cable, fiberoptic cable, wireless

19  telecommunications, etc.," and "may include a reading device, a high speed telecommunications

20  interface and/or a computer for entering the video data from electronic data format into the system."

21  *Id.* col.5 ll.34-43.

22  To the extent the specification is not explicit that first data storage unit necessarily excludes

23  the receipt of electronic video data, claim 11, which depends on claim 10, adds the second data input

24  station limitation to claim 10 ("11. The video-on-demand system of claim 10, further comprising: a

25  second data input station configured for uploading original video data . . . from *electronic data*

26  *format* . . . ."), making it unquestionable that claim 10, and the first data input station, exclude receipt

27  of electronic video data. *See SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1361 (Fed. Cir.

28  2012) ("Where, as here, the sole difference between the independent claim and the dependent claims

ORDER CONSTRUING CLAIMS OF U.S. PATENT NO. 7,254,622 —No. C-11-01208 HRLNo. C-11-01210 HRL

1   is the limitation that one party is trying to read into the independent claim, 'the doctrine of claim

2   differentiation is at its strongest.'" (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910

3   (Fed. Cir. 2004))).  Nomura has not identified any intrinsic evidence to overcome the presumption of

4   claim differentiation.  Nomura relies only on the parts of the specification referencing the *second*

5   data input station to support his claim construction, which are inapposite.

6       Accordingly, the court adopts defendants' proposed claim construction, eliminating the

7   redundant language, and construes the term "a first data input station configured for uploading" to

8   mean: "a hardware device configured to receive."

9       **5.  "errors in the . . . video data files" [claims 1, 12]**

| Defendants' Construction | Nomura's Construction |
|---|---|
| "deviations from accuracy within the . . . video data files" | ordinary meaning; or<br><br>"discrepancy from the expected value . . . in video data files" |

14   The claim describes both errors within the video data files themselves and errors that "are

15   detected in the downloading of the . . . video data file." '622 Patent col.11.47-59, col.13, ll.41-55,

16   and col.14 ll.49-62.  The parties do not dispute that the asserted claims encompass both types of

17   errors.  Defs.' Response Br. 14 ("[T]he claimed system monitors very specific types of 'downloading

18   errors'–errors that occur in transmission and/or within the video data files themselves."); Pl.'s Reply

19   Br. 14 ("[T]he specification is explicit that both transmission and downloading of the video data files

20   are monitored for errors . . . .").  Nomura's primary concern is that "[d]efendants construction

21   specifically limits the system to detecting errors only *within* the video data files, thereby excluding

22   errors related to transmission."  Reply Br. 14.  To the extent there is confusion as to which type of

23   "errors" are at issue here, the court is only construing the term "errors *in the . . . video data files*"

24   (emphasis added), which is the term designated for construction by the parties.  Downloading errors

25   are not in dispute, and the court clarifies that it is *not* construing the phrase "*errors . . . detected in*

26   *the downloading* of the . . . video date files," found in claims 1 and 12 of the '622 Patent at

27   col.11.58-59, col.13, ll.54-55, and col.14 ll.61-62.

28

United States District Court
For the Northern District of California

1    The first issue is whether the term "errors" in the phrase "errors in the . . . video data files"

2    needs construction, or whether the meaning of the word "error" in the context of the '622 Patent

3    would be commonly understood by a lay fact finder.  A secondary issue is whether the word "within"

4    should replace the word "in" in the claim term.

5    Nomura argues that the term "error" requires no construction because it has a commonly

6    understood plain and ordinary meaning.  Nomura also asserts that the addition of the word "within"

7    imports redundant words into the term that would not make sense in the context of the claim as a

8    whole.  Defendants do not counter that the term "error" is *not* commonly understood; rather, they

9    simply argue that the court should adopt an extrinsic definition because the term "error" is not

10   expressly defined in the specification.   Defendants also counter that errors detected must be *within*

11   the video data files because the word "in" means "located inside or within."   Response Br. 15 (citing

12   Webster's New Collegiate Dictionary (1981) 573, Ex. 7).

13   The court agrees with Nomura with respect to both issues, and declines to construe the term

14   error.  This case is not like *O2 Micro*, where the Federal Circuit held that district courts must

15   construe even common terms where there is "more than one 'ordinary' meaning," or where the

16   "'ordinary' meaning does not resolve the parties' dispute."  521 F.3d at 1361.  In contrast, here,

17   Nomura's dispute centers around whether the defendants' proposed construction would, or would not,

18   exclude downloading errors.  As the court has made clear, the construction pertains only to the

19   phrase "errors in the . . . video data files," and does not somehow eviscerate the separate

20   downloading errors limitation in the claims.  As such, the parties are left with no real dispute.  The

21   parties' proposed definitions, both taken from dictionaries, do not meaningfully alter the scope of the

22   disputed claim term "error."  *See ProconGPS, Inc. v. Skypatrol, LLC*, No. 11-03975, 2012 WL

23   3276977, at *7 (N.D. Cal. Aug. 9, 2012) ("Neither of defendants' proposed definitions meaningfully

24   alters the scope of 'data link,' and therefore the Court declines to further construe the term likely

25   selected by the inventor for the sake of brevity."); *Gen-Probe Inc. v. Becton Dickinson & Co.*, No.

26   09-2319, 2011 WL 7167137, at *17 (N.D. Cal. Nov. 22, 2011) (declining to construe "common

27   terms that need no clarification"); *Motorola Inc. v. Nonin Medical, Inc.*, 632 F. Supp. 2d 804, 813

28

United States District Court
For the Northern District of California

1  (N.D. Ill. 2008) (declining to construe the terms "error correction and diagnosis unit" and "error

2  correction unit" because the terms are readily understood by those of skill in the art).

3      Moreover, there is no basis upon which to construe the term "errors *in*" as "errors *within*."

4  The claims explicitly state where the respective errors occur.  To add the term "within" to the

5  construction would be an exercise in redundancy.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d

6  1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and

7  technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for

8  use in the determination of infringement.  It is not an obligatory exercise in redundancy.").

9      For these reasons, the court declines to construe the term "error" and adopts the plain and

10  ordinary meaning.

11      **6.  "an error detection system" [claims 1, 12]**

| Defendants' Construction | Nomura's Construction |
|---|---|
| indefinite means-plus-function limitation; or | ordinary meaning; or |
| "a system for detecting errors [deviations from accuracy] that occur within the video data files during downloading" | "a system for discovering errors" |

        *a. Means-Plus-Function Analysis*

17      The primary issue is whether this term is claimed in means-plus-function format pursuant to

18  35 U.S.C. 112 ¶ 6, which provides:

19          An element in a claim for a combination may be expressed as a means or step for
20          performing a specified function without the recital of structure, material, or acts in
            support thereof, and such claim shall be construed to cover the corresponding
21          structure, material, or acts described in the specification and equivalents thereof.

22  In the absence of the words "means" or "means for" in the claim, the presumption is that the claim is

23  *not* drafted in means-plus-function form.  *Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*, 649

24  F.3d 1350, 1356, 1358 (Fed. Cir. 2011) (reversing the district court's holding that the terms

25  "modernizing device" and "computing unit" were drafted in means-plus-function form and holding

26  that both terms "connote[] sufficiently definite structure to those of skill in the art").  "[T]he

27  presumption flowing from the absence of the term 'means' is a strong one that is not readily

28  overcome." *Id.* at 1356.  However, "the presumption *can* be overcome if the challenger demonstrates

United States District Court
For the Northern District of California

1   that the claim term fails to recite sufficiently definite structure or else recites function without

2   reciting sufficient structure for performing that function." *Id.* (internal quotations omitted) (emphasis

3   added). In considering whether the claim recites sufficiently definite structure, the court may

4   consider "evidence intrinsic to the patent [including any express definition of the claim term in the

5   *specification] and* any relevant extrinsic evidence." *Id.* (emphasis added). The question before the

6   court essentially boils down to "whether skilled artisans, after reading the patent, would conclude

7   that a claim limitation is *so devoid of structure* that the drafter constructively engaged in means-plus-

8   function claiming." *Id.* at 1357 (emphasis added).

9        If the court determines that the claim limitation is "so devoid of structure" that it is

10  constructively in means-plus-function form, "[t]he next step is to identify the corresponding structure

11  set forth in the written description that performs the particular function . . . ." *Asyst Techs. Inc. v.*

12  *Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). If the specification does not disclose a

13  corresponding structure, then the limitation is indefinite. *Tech. Licensing Corp. v. Videotek, Inc.*,

14  545 F.3d 1316, 1338 (Fed. Cir. 2008).

15       Defendants argue that this is a means-plus-function limitation under § 112 ¶ 6 because the

16  claim "does not disclose any structure associated with the 'error detection system' limitations."

17  Response Br. 12. As such, defendants argue that the "error detection system" limitations are

18  indefinite for failure to recite corresponding structures in the specification. In the alternative,

19  defendants argue that their proposed construction is correct because the errors detected must be

20  *within* the video data files.

21       Nomura argues the term "error detection system" is not devoid of structure, but rather

22  connotes ample structure to one of skill in the art. According to Nomura, the term "error detection

23  system" has a generally understood meaning to one of skill in the art. Even if this were a

24  constructive means-plus-function limitation, Nomura argues that the specification discloses structure

25  for the error detection system. Finally, Nomura argues that defendants' construction imports

26  redundant words into the term that are already found elsewhere in the claim.

27       This case is similar to *Inventio AG*, where the Federal Circuit held that the terms

28  "modernizing device" and "computing unit" connoted sufficiently definite structure to those of skill

ORDER CONSTRUING CLAIMS OF U.S. PATENT NO. 7,254,622 —No. C-11-01208 HRLNo. C-11-01210 HRL

United States District Court
For the Northern District of California

1  in the art to avoid being interpreted as constructive means-plus-function limitations.  649 F.3d at

2  1358-60.  In that case, the Federal Circuit emphasized that "the presumption flowing from the

3  absence of the term 'means' is a strong one that is not readily overcome."  *Id.* at 1356.  There the

4  court looked to both the claim language and the specification to conclude that the terms conveyed

5  structure to skilled artisans.  *Id.* at 1358-60.  Applying a similar analysis here, the claims themselves

6  connote sufficient structure to the "error detection system."  First, the word "system" in and of itself

7  *is* a structure in the context of computers.  *See, e.g., Chicago Bd. Options Exchange, Inc. v. Int'l*

8  *Securities Exchange, LLC*, 677 F.3d 1361, 1367, 1369 (Fed. Cir. 2011) (holding that the "system

9  memory" structure in the specification was "the disclosed structure clearly associated with 'system

10  memory means,'" the stipulated means-plus-function limitation in the claim); *see also* '622 Patent

11  col.7 ll.24-26, col.10 ll.2-3 (defining the "error detection system" as "error detection and correction

12  *software*" (emphasis added)).  Likewise, "error detection" is commonly understood in the art to be

13  carried out using a computer program.  *See* M.S. Computer Dictionary (5th ed. 2002), Opening Br.,

14  Ex. G ("**Error Detection and Correction** *n.* a method for discovering and resolving errors during

15  file transfer.  Some *programs* only detect errors; others detect and attempt to fix them."; "**Error**

16  **Checking** *n.* A method for detecting discrepancies between transmitted and received data during file

17  transfer.").  Second, the surrounding claim language connotes additional structure by requiring that

18  the "error detection system" be "*configured* to stop the downloading . . . if an error is detected" and

19  "*configured* to initiate the video-on-demand system to restore the [file] . . . if repeated errors are

20  detected."  '622 Patent col.11 ll.49-59 (emphases added).  Defendants, thus, fail to meet their burden

21  of showing that the claims are "so devoid of structure that the drafter constructively engaged in

22  means-plus-function claiming."  *Invento AG*, 649 F.3d at 1357.

23                                *b. Construction*

24        Having decided that this is not a means-plus-function claim limitation, the court now

25  addresses the issue of whether the term "error detection system" needs construction.  As with the

26  term "errors in the . . . video data files," the court concludes that the parties' proposed constructions

27  for the term "error detection system" do not meaningfully differ from the plain and ordinary meaning

28  of the term as commonly understood in the art.  *See* M.S. Computer Dictionary definitions for "Error

1    Detection and Correction" and "Error Checking" *supra*. The defendants' proposed construction also

2    attempts to limit the detected errors to those "that occur within the video data files during

3    downloading." The claim provides, however, and the parties do not dispute, that the "error detection

4    system" also detects downloading errors. '622 Patent col.11.58-59, col.13, ll.54-55, and col.14 ll.61-

5    62; Defs.' Opp. Br. 14; Pl.'s Reply Br. 14. Defendants' added limitation is thus inconsistent with the

6    claim language, and rejected.

7        There being no remaining substantive disagreement between the parties regarding the

8    meaning of the term "error detection system," the court declines to construe the term and adopts the

9    plain and ordinary meaning. *See Motorola*, 632 F. Supp. 2d at 813 (declining to construe the terms

10   "error correction and diagnosis unit" and "error correction unit" for similar reasons).

11       **7. "restore" [claims 1, 12]**

12   

| Defendants' Construction | Nomura's Construction |
|---|---|
| "return to the condition before data corruption" | ordinary meaning; or |
| | "return to the former condition" |

15       Again, the primary issue is whether the term "restore" requires construction. Nomura argues

16   that the plain and ordinary meaning is sufficient because, "[r]estore is a term well understood to both

17   lay people and a person having ordinary skill in the art, alike." Opening Br. 21. In the alternative,

18   Nomura argues that defendants' construction imposed additional, unclaimed limitations on the

19   system: "For example, if the original video medium contained an error (or was corrupt), then it

20   would be physically impossible for the [video on demand] system to restore the video data file to its

21   'state before error corruption. . . . Defendants construction assumes that . . . the back[-]up video data

22   file, or video data file from a previous tier, had no error." Reply Br. 16. Defendants argue that

23   Nomura's proposed construction, "return to the former condition," could allude to any possible

24   former condition, and is therefore indefinite.

25       The parties are, in effect, in agreement as to the plain and ordinary meaning of "restore," but

26   take issue only with respect to each others' proposed constructions of the term. Both parties agree

27   that, if an error is detected, the file is restored from the specific video data file or video data storage

28   unit recited in the claim. Response Br. 16-17 (emphasizing the particularly claimed video data files

United States District Court
For the Northern District of California

1   and storage units that contain the back-up files used for restoration); Reply Br. 16 ("If 'data

2   corruption is detected' or 'if repeated errors are detected' the [video on demand] system will restore a

3   video data file from other locations in the system.").  The plain and ordinary meaning of the term

4   "restore," as limited by the claim itself, addresses both parties' concerns.  First, if the court declines

5   to construe "restore," there is no ambiguity or indefiniteness issue (defendants' concern) as to the

6   condition of the restored file because the remainder of the claim explicitly states *where* the files are

7   to be restored from: either (1) "*from the original video data files on the first generation video data*

8   *storage unit* if repeated errors are detected in the downloading of the second generation video data

9   file"; (2) "*from the second generation video data files on the second generation video data storage*

10  *unit* if repeated errors are detected in the downloading of the temporary video data file"; or (3) "*from*

11  *the back-up [first/second] generation video data storage unit*."  '622 Patent, col.11 ll.18-24 and 44-

12  59 (claim 1); *id.* col.12 l.67-col.13 l.3, col.13 ll.33-36 and 45-55, col.14 ll.57-62 (claim 12).

13  Likewise, under the ordinary meaning, there is no additional limitation requiring the video data files

14  in the back-up video data storage files or storage units to *always* be error free (Nomura's concern,

15  *e.g.* in the event an uploaded back-up file was, for some reason, corrupt).  Because the plain and

16  ordinary meaning of the term "restore" is commonly understood without additional construction, and

17  because the ordinary meaning leaves nothing in dispute, the court declines to construe the term

18  "restore." *See U.S. Surgical Corp.*, 103 F.3d at 1568.

19                     **8.  "customers" [claims 1, 7, 8, 9, & 12]**

20          At the claim construction hearing, both parties agreed and stipulated that the term

21  "customers" should be construed as "system users."  The court adopts the parties' agreed upon

22  construction.

23

24          **9.  "The high speed data link being configured . . . [(a)] <u>to prevent uploading of</u>**
            **<u>data</u> from the [higher tier server/customer to the lower tier server], [(b)] <u>thus</u>**

25          **<u>resisting data corruption</u> of the [video data files on the lower tier server]"**
            **[claims 1, 12]**

26

| Defendants' Construction | Nomura's Construction |
| --- | --- |
| As Two Clauses (Defendants' preference): | |

| (a) "to prohibit the transmission of data other than video data file requests." (b) "thus preventing unintended changes to the video data files" | (a) "to protect against the uploading of data" (b) " that might corrupt the . . .video data files" |
|---|---|
| **As One Clause (Nomura's preference)** | |
| "The high speed data transmission connection that prohibits the transmission of data *other than video data file requests* from a [higher tier server/customer to the lower tier server], thus preventing unintended changes to the [video data files in the lower tier server]." | "The high speed data link being configured to protect against the uploading of data from the [higher tier server/customer to the lower tier server] that might corrupt the video data files on the [lower tier server]." |

This claim limitation relates to the permissible flow of data between the multiple tiers of the system. According to the claim, data cannot flow "upstream" from the second-tier unit to the first-tier unit, or from the customer's temporary data files back to the third-tier, remotely accessible unit, the purpose being to "resist[] data corruption." As a preliminary matter, the parties dispute whether the court should construe the disputed phrases (underlined in the heading) as one clause, or as two separate clauses. Either approach results in the court reaching the same claim construction, and thus, for brevity's sake, the court construes both disputed phrases as one clause.

The primary issue is what "data" the system prevents from being transferred, or "uploaded" in the upstream direction. Nomura argues that the only data that is prevented from flowing upstream is data "that might corrupt the . . . video data files." Defendants propose an exception wherein the system could only transfer video data file requests in the upstream direction, but where all other data would be "prohibited" (substituting the word "prohibit" for "prevent").

Nomura's proposed construction imports speculative language into the claim because it fails to define what kind of data, if any, "might corrupt the video data files." In turn, defendants' proposed construction carves out a limited exception for video data file requests that is nowhere present in the claims or specification. The court rejects both parties' proposed constructions.

The claim implies that the system's high speed data link prevents *all data* from flowing in the upstream direction. As both parties agree, however, such a construction would render the system inoperable because, as defendants acknowledge, "a lower tier of the system necessarily needs to send video file requests to a higher tier for the system to operate." Response Br. 20 n.8. According to Nomura, defendants' narrow exception–which would permit only video data file requests to flow

United States District Court
For the Northern District of California

1  upstream–is insufficient to render the system operative because the claims also require the system to

2  send upstream communications to perform the error detection and correction functions. *See* Reply

3  Br. 18-19. Nomura argues that "the 'prohibition against uploading' is meant to resist corruption of

4  the video data" and "not meant to stop all upstream transmission of data." *Id.* at 20.

5  The court agrees that the claims do not require the system to prevent *all* upstream

6  communications. In addition to video data file requests, the claim language is also unambiguous that

7  error detection and correction communications flow freely between tiers. The claims require an

8  "error detection system" that monitors downloading, and in the event of data corruption, restarts

9  downloading or restores the video data files. There can be no dispute that these functions require

10  communication in both directions. Instead of preventing all upstream communications, the claim

11  language only requires the system to prevent the "uploading" of data in the upstream direction. The

12  word "uploading" refers *not* to video data file requests, error detection and correction

13  communications, or other like communications, but rather to the video data files themselves. *See,*

14  *e.g.*, '622 Patent col.2 ll.58-59 ("Data input stations are provided to *upload original video data* of

15  movies or other video programs from their original storage medium."). The whole purpose of the

16  prohibition on "uploading" from higher tiers, or from the customer, back to a lower tier system server

17  is to prevent corrupt *video data files* from being uploaded into the video-on-demand system. *See,*

18  *e.g.*, *id.* claim 1, col.11 ll.42-44 (The claimed purpose of the limitation on uploading is " resisting

19  data corruption of the second generation video data files on the second generation video data storage

20  unit" where, in that claim, the "second generation video data files" would be used to restore the video

21  data files in the event of data corruption.). In the context of the claim as a whole, which describes

22  data corruption as occurring *in the video data files*, the only logical construction is that the system

23  prevents the "uploading" of video data files over the high speed data link to a lower tier system

24  server, but imposes no additional restrictions on the mere transmission of other communications

25  related to, for example, video data file requests or error detection and correction, between system

26  tiers. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are

27  interpreted with an eye toward giving effect to all terms in the claim."). Accordingly, the court

28  construes the phrase "to prevent uploading of data from the [higher tier server/customer to the lower

ORDER CONSTRUING CLAIMS OF U.S. PATENT NO. 7,254,622 —No. C-11-01208 HRLNo. C-11-01210 HRL

tier server], thus resisting data corruption of the [video data files on the lower tier server]" to mean: "to prevent uploading of video data files from the [high tier server/customer to the lower tier server], thus resisting data corruption of the [video data files on the lower tier server]."

### III. ORDER

For the foregoing reasons, the court construes the disputed terms as follows:

| Disputed Claim Term | The Court's Construction |
|---|---|
| "configured to not be remotely accessible [by customers]" | "configured to prevent or deny access by a [customer's] remote device" |
| "sorted by category and classified [in indexed master files]" | "organized by category and indexed in master files." |
| "a back-up . . . video data storage unit for storing back-up . . . video data files" | "an additional video data storage unit for storing copies . . . of the video data files" |
| "a first data input station configured for uploading" | "a hardware device configured to receive" |
| "errors in the . . . video data files" | no construction required |
| "error detection system" | not a means-plus-function limitation; no construction required |
| "restore" | no construction required |
| "customers" | "system users" |
| "The high speed data link being configured . . . [(a)] to prevent uploading of data from the [higher tier server/customer to lower tier server], [(b)] thus resisting data corruption of the [video data files on the lower tier server]"<br><br>(The court construes the underlined terms as one clause.) | "to prevent uploading of video data files from the [higher tier server/customer to the lower tier server], thus resisting data corruption of the [video data files on the lower tier server]." |

United States District Court
For the Northern District of California

1
2
3   **DATED:** _____2/8/13_____
4                                           _____
5                                           **HOWARD R. LLOYD**
6                                           **UNITED STATES MAGISTRATE JUDGE**
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28